[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
By petition filed January 24, 1991, and not thereafter amended, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Ana Ro. and Francisco Ru., mother and acknowledged father of Frank Ru. (Frankie), a child born February 10, 1988 who, since November 21, 1988, has lived continuously in foster care in the custody of the petitioner. Since Frankie was committed to DCYS on December 20, 1988 pursuant to Sec. 46b-129 of the Conn. Gen. Stats. (Rev. 1991), the action was brought under Sec. 17a-112 applicable to such children, the petitioner alleging three of the four nonconsensual grounds for such termination: Abandonment; failure to rehabilitate; absence of parent-child relationship.
At an initial hearing on February 21, 1991, service was confirmed on both parents, the mother in hand in Niantic prison, where she had been incarcerated for the four months preceding, and the father, whose whereabouts were unknown, by publication. At trial on April 22, 1991 the state rested and the matter continued to May 2, 1991 to permit Ana to put on her case. On that date she moved to dismiss the third alleged ground for failure of the state to establish a prima facie case, and decision was reversed on this issue. She then offered no evidence on her own behalf. The parties were given permission to file trial memoranda no later than June 10, 1991, the date on which the period of reserved decision is deemed to begin.
Facts
Evidence offered by the state, interpreted in light of the prior record in this court concerning this child and his family, supports the finding of the following facts:
Ana grew up in Hartford and Puerto Rico. She had only two years of schooling and is able to read and write in Spanish only. She has had eleven pregnancies: Four children died at birth. All of the others were premature, born at CT Page 6502 approximately seven months, and underweight due to Ana's chronic drinking problem which began when she was fifteen. (State's Exhibit D, Psychiatric assessment June 28, 1990). Frankie was born February 10, 1988, the sixth child of his then 33-year old mother. At the time of his birth, only one of his five siblings resided with the mother; the three of the others were living with the maternal grandmother who had been awarded legal custody of two in the probate court; one child lived with her biological father out of state. At the time of this trial, the only child remaining in the mother's custody, had herself had a baby at the age of 15 and lived apart from her mother.
Born prematurely, Frankie was kept in hospital until he was four months old. Two days after being discharged into the care of his mother, DCYS received a referral from Hartford Hospital when the infant was brought to the emergency room after being on the head during a physical altercation between his parents. Both of them were reported to have been intoxicated and the baby was injured while being held in the arms of the mother. Ana was arrested and the following day (June 18, 1988) she signed a voluntary permission for him to be placed in foster care. Upon her release two months later, Frankie was returned to her care. Less than three months after his return the police found Frankie, then nine months old, alone with his five-year old brother in a disordered apartment where cocaine residue was found on a table. Frankie was admitted to the hospital and the five-year old returned to his grandmother, who had been awarded his custody a month earlier. After four days in hospital, Frankie was ready to be discharged. Since his mother, who had not contacted DCYS since the children's placement, could not then be located, DCYS secured an Order of Temporary Custody (OTC) pursuant to subsection (b) of Sec. 46b-129, in order to be able to place him in foster care. On December 20, 1988, his mother, having declared her intent to enter an inpatient program at Blue Hills Hospital for the treatment of her admitted alcohol problem, agreed that her son was then uncared-for since she had no home to offer him due to her drinking problem. With the advice of counsel, she agreed to his commitment to DCYS and to the court's expectations for reunification: Visitation as often as permitted by DCYS social worker; engagement in counselling starting with the inpatient program at Blue Hills, which she was about to enter, and thereafter to seek outpatient counselling for her alcohol problem at the Institute for the Hispanic Family (IHF). She was also cautioned to keep her attorney and DCYS worker informed of her address at all times and warned that failure to achieve these goals could result in the filing of petition to terminate her parental rights (State's Exhibit B).
Ana did not enter Blue Hills. In fact, she did not CT Page 6503 participate in the inpatient program at Blue Hills until eighteen months later when, after being arrested for assault when intoxicated, she was referred there by the criminal court. (State's Exhibit D.) She visited Frankie at Christmas of 1988, but by January of 1989 she was back in Niantic prison after being arrested in a street fight. Frankie was brought to see her there once in February of 1989, and she also telephoned the foster home from prison. Upon her release in March, 1989, Ana informed the social worker that she was again pregnant, and was about to start treatment at the IHF in April of 1989. Regular weekly visits with Frankie began in May of 1989 and the IHF reported satisfactory compliance with attendance at the outpatient substance abuse program there. On June 29, 1989 Ana attended an administrative review of the semi-annual treatment plan which gave a clear warning that DCYS would seek termination of her parental rights unless she consistently sustained the visitation and counselling that had so recently begun. In the month following this administrative review, however, she visited her son only once, and by the first of August of 1989 she was back in jail. In her five months of freedom, between March and August of 1989, she visited Frankie seven times (State's Exhibit C, p. 4). At the time she returned to prison she expressed the desire for her sister, Lydia, to adopt Frankie if she could not regain his custody. DCYS investigated but Lydia declined. Upon her release from jail later that month, Ana entered a shelter where she was still living on September 12, 1989 when she gave birth to Juan A.R. She was offered the opportunity to enter a bilingual residential substance abuse program where she could have kept custody of her infant and, eventually, been joined by Frankie (Crossroads in New Haven) but she refused. When less than two months old, Juan A.R. was left with unrelated strangers who contacted DCYS. Coterminous petitions were filed pursuant to subsection (c) of Sec. 17a-112. An evaluation by a bilingual clinical psychologist was ordered. Ana arrived at the appointment for this evaluation intoxicated, voicing violent and delusional thinking. Given a long history of alcoholism manifesting itself in repeated incidents of physical violence, and her lack of motivation to change, the psychologist concluded that the prognosis was poor for Ana to recover sufficiently to be a safe caretaker for the infant. (See Appendix A, Memorandum of Decision In re Juan A.R., pp. 11-13). Following an extended trial, Juan A.R. was found to be both neglected and uncared for, and his mother's parental rights terminated on September 14, 1990.
During this period, Ana discontinued counselling at the IHF which closed her case in January of 1990. She requested no further visits with Frankie after the birth of Juan A.R. in September of 1989. Seven months after her last visit with CT Page 6504 Frankie (in July of 1989) the social worker contacted her to ask if she would like to see the child again. A visit took place February 27, 1990, at which time a schedule for regular visits in the DCYS office was established for alternate Tuesday afternoons, conditioned only upon Ana first calling on the morning of each visit to confirm her attendance. At the first scheduled visit two weeks later, Ana appeared at the DCYS office, but not having called to confirm that morning, Frankie had not been brought for the visit. She was offered the opportunity to visit on the following week. Again she did not call first so that the child, again was not brought to the visit. This time, however, Ana, too, failed to appear. There were no more calls for visits for the next four months, during which Ana was again incarcerated and transferred from prison to Blue Hills hospital where she completed a 28-day program on July 29, 1990. The next month, in August 1990, Frankie was moved to his fifth foster placement, with his maternal aunt, Placida, with whom Juan A.R. had been placed in anticipation of adoption. Ana, upon her discharge from Blue Hills, resumed outpatient counselling at the IHF and began regular visitation with Frankie in her sister's home. Placida permitted Ana free access to her son so long as she was sober when she arrived to visit.
Unfortunately, this brief period, during which Ana was compliant with the expectations both for regular visitation and alcohol counselling, was again short lived: In mid-October of 1990 Ana was arrested, convicted of second degree assault, and sentenced to Niantic for two years. She did not request any prison visits prior to the filing of this petition.
In summary, for the first twenty months of his commitment, Ana visited Frankie a total of nine times. The failure of DCYS to initiate this proceeding in 1989 or early in 1990 was never explained. Regular visitation only began in August of 1990 when Frankie was placed with Ana's sister, but stopped abruptly two months later with Ana's most recent arrest and incarceration — her seventh arrest for assaultive behaviors in the two years preceding institution of this action (State's Exhibit D). Unfortunately, this latest arrest occurred less than three months after Ana finally completed the inpatient treatment program at Blue Hills.
Ana has repeatedly sought alcohol counselling during the two and one-half years that Frankie has lived in foster homes: She met with a counselor at the IHF six times between April and July of 1989. When her counselor recommended treatment at Crossroads, where she could have kept custody of the baby born to her in September of 1989, she declined. After attending 12 more outpatients sessions, her case was closed by the IHF in CT Page 6505 December 1989, for noncompliance with appointments. After her Blue Hills inpatient treatment in June-July 1990, she returned to the IHF for a third time, and for a third time was discontinued, after keeping only four appointments, for nonattendance. Counselor Martinez testified that despite Ana's 20-year history of alcoholism, multiple incarcerations and the loss of custody of six of her seven living children, she never acknowledged that alcohol was a problem for her or that her drinking caused her to lose custody of six children. The IHF had opened a case for Ana 10 times since 1984; each time the case was closed for noncompliance. Following her single inpatient hospitalization since Frankie's birth, (the Blue Hills admission in the summer of 1990) she lasted less than three months before being again incarcerated for assault while under the influence of alcohol. When at Blue Hills, she acknowledged drinking one to two cases of beer daily when arrested in April of 1990, a fact which, in light of her 20-year history, caused the evaluating psychiatrist to term hers a "severe dependence." (State's Exhibit D). Her history since the summer of 1990 does not suggest the likelihood of any significant change in this twenty-year pattern.
Two months after this petition was filed, one month before the scheduled trial, Ana was released from Niantic, having served five months of her sentence. Since her release she has regularly visited Frankie at the home of her who reports the visits go well. Frankie, however, despite being told his relationship to Ana, has begun calling his aunt "Mommy" after eight months of consistent and satisfactory care in her home.
Summary of factual chronology:
By January 24, 1991, Frankie Ru. had been in foster care for all but three months of his nearly three years of life. He had been in four previous foster homes before being moved to the home of his maternal aunt, Placida, who has made a permanent commitment to both Frankie and his younger brother who is presently freed for adoption. During the two years since his commitment to DCYS, his mother has visited regularly for only two brief periods: In the spring of 1989 and again in August of 1990, after moving to his aunt's home. Each period ended with Ana's arrest and return to Niantic after approximately two months. Ana's most recent incarceration resulted from her seventh arrest since Frankie's birth (State's Exhibit D) and in her subsequent conviction for second degree assault.
In the three months between her incarceration and the institution of this action, she did not request prison visits. CT Page 6506 Since Frankie's commitment, Ana has entered outpatient counselling at the Institute of the Hispanic Family three times, each time being discontinued for failure to keep scheduled appointments. She has never fully acknowledged the severity of her 20-year drinking problem or its connection with the loss of custody of six of her seven living children. At no time since Frankie's commitment has she offered a plan for resumption of his care, although she has voiced the desire for her sister, or sisters, to care for him if she could not. At no time in this period has she had any residence in her own name when not incarcerated.
The father, whose whereabouts have at all times been unknown, has made no contact of any kind with Frankie, his foster parents or his legal guardian, DCYS, since his commitment.
Adjudication — as of date petition was filed or last amended, 1/24/91.
This record supports by clear and convincing proof all three of the pleaded grounds for terminating the parental rights of both parents:
Abandonment — The acknowledged father has abandoned the child, even under the common law definition of that term, since there has been a total, and presumably intentional, absence of the father from the child's life almost from the moment of birth. Ana has abandoned him, not under the common law definition but under the definition found in the statute as the failure ". . . to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." Apart from the two brief periods, more than a year apart, of frequent visits, Ana made no attempts ". . . to achieve contact with . . . [Frankie], telephone calls, the sending of cards and gifts and financial support" indicia of "interest, concern or responsibility." In re Migdalia M., 6 Conn. App. 194, 208-209
(1986). The court in that case also pointed out that the operative verb in the statutory definition was maintain, a word which ". . . implies a continuing, reasonable degree of concern" (Id. at 210) rather than sporadic bursts, interposed with longer periods of total silence. This record provides clear and convincing proof that throughout the twenty-nine months of his continuous foster placement between August of 1988 and the filing of this petition in January of 1991, Frankie's mother failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of her son. The fact that Ana was released from prison two months after the adjudicatory date and began visiting regularly at the home of her sister where Frankie now lives may not be considered CT Page 6507 in the adjudicatory phase of this case; its relevance is as to disposition ("best interest") if grounds for termination are found as of the earlier adjudicatory date.
Failure to Rehabilitate — The only references to Frankie's father in this record occurred when Frankie was injured two days after being placed at home with his mother when she and the father, both reportedly intoxicated, became embroiled in a physical fight while Ana was holding the infant. Presumably the head injury was suffered from a blow delivered by the father and intended for Ana. No other reference is made to him in any of the records thereafter. His failure to make himself known to the child or his caretakers more than two years after being placed in DCYS custody is clearly a failure "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . [he] could assume a responsible position in the life of the child." Ana, while intermittently elusive, has been know to the child and his caretakers throughout this period. She agreed to the court's expectations at the time of commitment, but she has fulfilled at none of them: She has not visited as often as DCYS permitted. After seven months without any contact with her son, Ana agreed to a definite schedule for bi-weekly visitation . . . but failed to visit once thereafter. She has not complied with alcohol treatment. She has not kept DCYS informed of her whereabouts. She has continued a two-decade long pattern of severe alcoholism, punctuated by arrests for assaults and incarcerations, the most recent being less than three months after completing an inpatient treatment program. Her inability to sustain alcohol treatment for more than a few months, or to refrain from becoming intoxicated without treatment, as well as the continuing pattern of assaults, arrests and incarcerations supports by clear and convincing proof that she too has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child . . . [she] could assume a responsible position in" Frankie's life. (Cf In re Migdalia M., supra at 207). Again, what progress she may have made since her release from prison two months after the adjudicatory date may be considered only as to disposition, if grounds for termination can be found as of that date.
Absence of parent-child relationship — There can be no question that there could be, between Frankie and a father he has not seen since infancy, no relationship of any kind, much less an ongoing parent-child relationship of any kind, much less an ongoing parent-child relationship as defined in the statute. There can also be no question that whatever relationship may exist between Frankie and his mother as a result of the two CT Page 6508 brief spurts of visitation (May and July of 1989: August to October of 1990), it cannot be an "ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." Even with the gloss put on that definition by the Supreme Court in In Re Jessica M., 217 Conn. 459 (1991), such relationship cannot be found to exist here. Under that decision, this ground cannot be found unless it is also found that "the child has no present memories or feelings for the natural parent." (Id. at 468). This language, quoted from the same court's own opinion eleven years earlier in In Re Juvenile Appeal (Anon.), 177 Conn. 648 at 670 (1970) was later modified to avoid a "bizarre result" to mean only memories which are positive. In Re Juvenile Appeal (84-6),2 Conn. App. 705 at 709 (1984), cert. denied 195 Conn. 801. Whatever actual memories a three-year old might still have of a time when he was a neglected six-month infant must be presumed to be dim and negative at best, based upon the circumstances of both of Frankie's precipitate removals from his mother's care: Once after being struck in the head after a drunken altercation between his parents; again after being abandoned with his five-year old brother. Whatever positive feelings he may have had for Ana on the adjudicatory date must, therefore, be presumably based upon the visits he had had with her between August and October of 1990 when she was visiting him in her sister's home. Before that, he had seen his mother only twice in the year preceding — once in July of 1989 and again, at the urging of DCYS, on February 27, 1990. Sporadic contacts with a very young child do not preclude finding this ground for terminating parental rights. In Re Juvenile Appeal (Anon.), 181 Conn. 638 (1980), cited with approved in In Re Jessica M., supra at 469. According to Placida, the visits between August and October of 1990 went well, and it is a fair inference that the child was beginning to develop some kind of relationship with Ana. But the test is whether the child has present positive memories or feeling for the natural parent as a parent, and not as a pleasant visitor. Nothing in this record suggests that Frankie views Ana as his "mommy", a name he reserves for his present caretaker. It is reasonable to infer, since he can have no present memories of living with his biological mother, that whatever positive feelings he may have for her, are for her as recent visitor, not as a parent. This supports by clear and convincing proof that no parent-child relationship exists, as defined by statute. That fact alone, however, is not sufficient to be grounds to terminate a parent's rights. The court must also find by the same standard of proof that ". . . to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the CT Page 6509 child." With regard to the father, the proof is overwhelming that the allowance of further time would do nothing to bridge the gulf caused by the father's abandonment of the child in infancy. The proof is nearly as great regarding Ana; Despite the two brief periods of visitation between incarcerations, nothing in this record suggests that the future will hold anything different for Ana than has the past three years: She has never sustained alcohol treatment for more than a matter of weeks. She has never maintained sobriety, with or without treatment, for more than a matter of months. When she drinks, she becomes embroiled in physical altercations which result in arrests (seven in Frankie's lifetime) and multiple incarcerations. By the time DCYS (belatedly) initiated this petition, Ana had been sentenced to the longest prison term she had ever received. During the last two and one-half years Frankie has been moved five times, and only since moving to his aunt's home has he lived with someone committed to and capable of providing him with care indefinitely. To make him wait even longer than the three-year lifetime he has already waited for a permanent home, would clearly be detrimental to his best interest. The respondent's motion to dismiss this ground is, therefore, denied.
Disposition — on facts as of final day of trial, 5/2/91
A month before the first day of trial on April 22, 1991, Ana was released from Niantic. She is once again entering outpatient alcohol treatment, and has once again resumed visiting her son in the home of her sister. This improvement in her situation is as it was in the spring of 1989 and again in the early fall of 1990. Nothing in this record reasonably supports the prediction that the pattern of years will be broken and that this time her sobriety, stability, avoidance of criminal proceedings and maintenance of sustained interest in her son will last longer than it has in the past. A full year of such improvement might give rise to a reasonable prediction that her rehabilitation has begun but Frankie cannot afford to wait longer than his three-year lifetime before knowing where is his permanent home.
Before the court may consider terminating a parent's rights, however, it is required to consider the six factors set forth in subsection (d) of Sec. 17a-112.
(1) No services could be offered by an agency to facilitate reunion of a child with a father whose whereabouts are unknown. As to the mother, this record is replete with references to service offered to her: Referrals repeatedly made to alcohol treatment facilities. Repeated suggestions that visitation be frequent and regular. No requested visits were ever refused. CT Page 6510 Without regular visitation and the successful addressing of her alcohol problem, no other services could be offered to effect the reunification of this traumatized family.
(2) No orders were entered in this case, other than for appearance in court with which the mother complied, but clear expectations were spelled out at the time of Frankie's commitment in December of 1988, and in both major areas these expectations were not fulfilled: Ana did not visit her son as frequently or as regularly as DCYS not only permitted but recommended; she did not engage consistently or effectively in treatment for her severe, debilitating and long-standing alcohol problem.
(3) There was no evidence to support a conclusion that Frankie recognized the woman who began to visit him in August of 1990 as his mother. Soon after moving in with his aunt, he began to call her "Mommy." While contact with his mother had no reported negative impact on him, neither did the long periods during which there was very little contact. (Nine visits in the first 20 months after commitment). Although only placed with her for nine months, as of the final day of trial, Frankie already regarded his aunt as his "mommy" as she is for his younger sibling, Juan A.R.
(4) Frankie is over three years old. He has spent all but three months of his life in foster care and, since last August, for the first time has found himself living with a capable, committed, loving relative who is willing to adopt him if he is free for adoption, while willing to permit continued contact with his mother. He needs this assurance of permanent placement without longer delay, before he enters the still more challenging world of public school. He should not have yet another birthday without knowing where is "home" and who is "mommy."
(5) Frankie's father has made no effort to do anything to make it advantageous for Frankie to be placed in his care. Ana has made repeated efforts at counselling and visiting, but never sustained either long enough to have any beneficial impact on the child. She has visited him infrequently until he was placed in the home of her sister, and even visitation there was soon interrupted by new criminal activity and her consequent incarceration.
(6) Nothing has prevented Ana from maintaining a meaningful relationship with Frankie except her own 20-year, so far unsuccessful, battle with alcoholism.
Having considered the foregoing, it is found, by clear CT Page 6511 and convincing proof, to be in the best interests of Frankie Ru. for his parents' rights to be terminated so he may have, for the first and only time in his life, a permanent home with a competent, committed parent through adoption. Therefore, it is ORDERED that the parental rights of Ana Ro. and Francisco Ru. in and to the child Frankie Ru. be, and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption, and that such Commissioner shall file, no later than 90 days from the date of this judgment, a written report as to the progress toward such adoption. If adoption of the child is not then finalized, the said Commissioner is further ORDERED to file a Motion for Review of Plan for Terminated Child no later than October 15, 1992 to ensure judicial review not more than 18 months following this judgment in compliance with the requirements of federal law.
Appeal
The parent has 20 days from the date of this judgment in which to take an appeal. If she decides to pursue an appeal and her counsel at trial is willing to represent her in it, this court will appoint him to act as appellate counsel at public expense until all appellate process is completed. If, however, in the exercise of his professional judgment as an officer of the Superior Court, he declines to perfect such appeal because, in his opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Such motion, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, he or she is required promptly to submit to the court in writing the reasons for this opinion. The parent will then be informed by the court clerk that there is the balance of the 40 days in which to secure her own counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. This procedure conforms to the principles of Douglas v. California, 372 U.S. 353 (1963), adopted for Connecticut in Fredericks v. Reincke, 152 Conn. 501
(1965), in which it was held to satisfy an indigent criminal defendant's constitutional right to counsel on appeal if, after the public defender at trial notifies both client and court that "he could not conscientiously proceed with the appeal," another attorney is appointed to consider the merits of the appeal and comes to the same conclusion. Even a convicted criminal defendant "cannot demand that the trial CT Page 6512 court find and appoint other counsel who will advise such appeal" after the second public defender has declined to do son Fredericks v. Reincke, 152 Conn. at 505. If such procedure satisfies the sixth amendment rights to counsel where the only conflicting interests are those of a defendant who seeks review of his conviction and of the state which has a legitimate interest in avoiding the expense and judicial burden of meritless appeals, it is a fortiori appropriate where there are interests of third parties involved: those of the child whose interest in achieving permanent planning for this child for years since no child may be adopted until the appellate process is exhausted and the termination order final.
If an appeal should be taken, the judgment of termination shall be stayed during its pendency, but throughout this period all decisions made by DCYS, as the child's continuing legal guardian, as to contacts with his natural parent shall be based solely upon the child's best interests, not upon the parent or the lingering possibility of an eventual reunification. Whatever obligation is imposed upon DCYS by federal and state law to make continuing efforts to reunited committed children with natural parents ends upon a judicial finding that grounds exist to terminate parental rights.
Entered this 8th day of July 1991.
BRENNEMAN, J. CT Page 6513